**HUSCH & EPPENBERGER, LLC,**
**Plaintiff/Respondent,**

v.

**Elizabeth EISENBERG,**
**Defendant/Appellant.**

**No. ED 87712.**

Missouri Court of Appeals,
Eastern District,
Division One.

Dec. 12, 2006.

Application for Transfer to Supreme Court
Denied Jan. 18, 2007.

Application for Transfer Denied
Feb. 27, 2007.

---

1. All rule references are to Mo. Rules Crim. P.2004, unless otherwise indicated.

See also 38 S.W.3d 409.

Richard W. Fischer, O'Fallon, John T. Ahlquist, Clayton, MO, for appellant.

Jeffrey D. Sigmund, St. Louis, MO, for respondent.

CLIFFORD H. AHRENS, Presiding Judge.

Elizabeth Eisenberg appeals from the judgment of the trial court reforming the Agreement and Mutual Release ("Release") entered into between Eisenberg and the law firm of Husch & Eppenberger on June 15, 1994. Finding no error, we affirm.

In 1992, the law firm of Husch & Eppenberger, then a partnership, represented Eisenberg regarding the estate of Eisenberg's mother. Eisenberg was primarily represented by two attorneys at Husch & Eppenberger, Brad Goss and Barnett McKee. Following the conclusion of Husch & Eppenberger's representation of Eisenberg, she disputed the amount of legal fees owed to the law firm, asserting that she was not satisfied with services provided and did not receive value for the services billed. Husch & Eppenberger settled the dispute by reducing Eisenberg's fee somewhat, and in exchange she executed the Release, which was signed on June 15, 1994. The Release provided that:

> The Law Firm [Husch & Eppenberger] and Elizabeth Eisenberg hereby fully and forever release, acquit, and discharge the other and all of the other's successors and assigns from any and all actions, causes of action, claims and demands of whatsoever nature or kind arising out of any rights accruing to either of the parties hereto by virtue of the Law Firm's representation of Elizabeth Eisenberg at any time prior to the date of this Agreement.

The Release was signed by Eisenberg and by McKee, who was designated as a partner below the signature line. Neither McKee nor Goss was specifically named in the Release. Goss had resigned from the firm on April 15, 1994, and McKee was actually of counsel on June 15, 1994.

In 1998, Eisenberg sued Charles Redd, McKee, and Goss for legal malpractice. They filed a motion for summary judgment on the basis that the Release absolved them individually from liability. The trial court entered summary judgment in favor of Redd, McKee, and Goss. In *Eisenberg v. Redd*, 38 S.W.3d 409 (Mo. banc 2001), the Missouri Supreme Court reversed the grant of summary judgment and remanded the case, stating that "law firm" as used in the Release meant the partnership as it existed on June 15, 1994, and included only those lawyers who were actually partners of the firm at that time.

The case was remanded to the trial court for further proceedings. Eisenberg voluntarily dismissed her lawsuit and refiled a petition for legal malpractice against McKee and Goss in 2002. McKee and Goss separately filed motions for reformation of the Release prior to May 2004. The trial court denied these motions in October 2004 on the basis that neither McKee nor Goss was a party to the Release. On January 28, 2005, Husch & Eppenberger, LLC ("Husch–LLC"), filed an action for reformation of the Release. Husch–LLC alleged that it was the intent of Eisenberg and Husch & Eppenberger that McKee and Goss be covered by the terms of the Release, and that the Release

failed to reflect the true intent of the parties, and failed due to mutual mistake. McKee filed a motion to intervene, which was granted.

The trial court issued findings of fact and conclusions of law in its judgment on January 26, 2006. It found, among other things, that the Release was drafted by Eisenberg's attorney, and was executed on June 15, 1994 by McKee on behalf of Husch & Eppenberger. The trial court found that it was the intent of Husch & Eppenberger and Eisenberg in executing the Release to release all persons associated with the law firm during the period when it provided legal services to Eisenberg. Among its conclusions, the trial court stated that:

3. When, by mutual mistake, a contract or other instrument is not expressed in such terms as to have the force and effect that the parties intended, it is the clear duty of the court to correct the mistake.

4. Due to mutual mistake in the description of the parties to be released, the terms of the Release do not accurately reflect the true intent of Husch & Eppenberger and Eisenberg.

5. There is no language in the opinion of the Missouri Supreme Court in the case of *Eisenberg v. Redd*, 38 S.W.3d 409 (Mo. banc 2001) that bars this action for reformation of the Release. Neither is there any principle of law that bars the bringing of this action....

8. Eisenberg's affirmative defenses of statute of limitations and laches fail, because Husch & Eppenberger did not discover until February 30, 2001—the date of the decision in *Eisenberg v. Redd*, 38 S.W.3d 409 (Mo.2001)—that, *as written*, the Release did not effect a release of Goss and McKee. It was not

until Eisenberg's deposition on November 5–6, 2003 that Husch & Eppenberger realized the existence of a mutual mistake, upon which a cause of action for reformation could thereafter be maintained.

The trial court's judgment ordered that the Release be reformed "so as to reflect the true intent of the parties[,]" and attached and incorporated the reformed Agreement and Mutual Release as Exhibit 1. Eisenberg now appeals from this judgment.

In her first point relied on, Eisenberg contends that the trial court erred in failing to dismiss the cause of action as barred by the statute of limitations because the statute of limitations for an action of reformation is ten years and it accrues on the date that the mistake is made. Eisenberg argues that the mistake in the present case was made on the date that the Release was executed, June 15, 1994, and the present cause was not filed until January 28, 2005, more than ten years after the cause of action accrued.

■■■ Whether or not the statute of limitations applies to an action is a question of law that this Court reviews *de novo*. *Branstad v. Kinstler*, 166 S.W.3d 134, 135 (Mo.App.2005). The party asserting the affirmative defense of the statute of limitations has the burden of establishing it. *Id.* at 137.

There is no dispute that the statute of limitations for a contract reformation action is ten years. Section 516.110 RSMo 2000[1]; *Nuspl v. Missouri Medical Insurance Company*, 842 S.W.2d 920, 923 (Mo. App.1992). Section 516.100 specifically provides that for purposes of sections 516.100 to 516.370, a cause of action is deemed to accrue "when the damage resulting therefrom is sustained and is capa-

---

1. All further statutory citations are to RSMo 2000 unless noted otherwise.

ble of ascertainment." The Missouri Supreme Court has recently articulated the test for when damages are capable of ascertainment: *"The statute of limitations begins to run when the 'evidence was such to place a reasonably prudent person on notice of a potentially actionable injury.'"* *Powel v. Chaminade College Preparatory, Inc.,* 197 S.W.3d 576, 582 (Mo. banc 2006) (emphasis in original) (quoting *Business Men's Assurance Co. v. Graham,* 984 S.W.2d 501, 507 (Mo.1999)). There is no question that the Release was entered into on June 15, 1994, and the suit in the present case was filed on January 28, 2005. The issue is when did the statute of limitations begin to run.

■ In the present case, the fact of damage became capable of ascertainment and the cause of action for reformation of the Release accrued when the Missouri Supreme Court's opinion in *Eisenberg* became final in 2001. At that point the evidence was such that a reasonably prudent person would have been placed on notice of the meaning of the term "law firm" as used in the Release, and that "law firm" did not include Goss and McKee, and accordingly that a cause of action for reformation of the Release had accrued.[2] Prior to that time, a reasonably prudent person would not have been placed on notice. We note that Eisenberg in her video deposition in 2003, portions of which were played at trial and admitted into evidence, testified that she intended that the Release would include Goss and McKee, and that she had discussed the Release with her attorneys before she signed it. There were the following exchanges:

Ms. Miller: It was your intent, at the time, to release Brad Goss, was it not?

Eisenberg: That's what this [the Release] says.

. . .

Miller: Okay. So the people you thought you were really talking about here were Brad Goss and Mike McKee, is that right?

Eisenberg: Correct, that's what I thought.

. . .

Miller: Okay. So you got your benefit of the bargain, correct?

Eisenberg: Yes; correct.

Miller: Okay. And in return for that deal, you were releasing Mike McKee and Brad Goss for any claims you might make due to their representation of you up until this point in time, June 15, 1994, isn't that right? That was your understanding at the time.

Eisenberg: Yes.

Several years later in the trial of this case, Eisenberg again testified that it was her intent in executing the Release to include Goss and McKee.[3] The following exchange took place:

Dowd: Okay. Now, to you the law firm meant and included everybody that

---

**2.** The Missouri Supreme Court held in *Eisenberg,* 38 S.W.3d at 409–11, that the trial court's grant of summary judgment in favor of the defendants was not appropriate under the standard of review for such cases, and remanded for further proceedings. It did not address the issue of reformation of the Release, or when such a cause of action accrued.

**3.** Eisenberg's testimony that she intended that the release would include Goss and McKee was in contrast to her position in *Eisenberg,* 38 S.W.3d at 410. In that case, she argued that "release of the 'law firm' pertained only to persons who were partners of Husch & Eppenberger on the date of the release, and because respondents [Redd, Goss, and McKee] were not partners at that time, and were not specifically named in the release, they were not included."

worked at Husch Eppenberger, is that correct?

Eisenberg: Yes.

Dowd: Okay. And you understood that McKee and Goss worked at Husch Eppenberger when they represented you, correct?

Eisenberg: Yes.

It is apparent from Eisenberg's testimony that she intended to include Goss and McKee in "law firm" as it was used in the Release drafted by her legal counsel, with whom she discussed the Release. Charles Merrill, the chief executive officer of Husch–LLC at the time of the trial and a partner at the law firm since 1984, testified that it was the intent of the law firm when it executed the Release that all attorneys and employees of the firm, including Goss and McKee, would be included in the Release. The evidence was not such as to place a reasonably prudent person on notice of a potentially actionable injury until after the Missouri Supreme Court's opinion in *Eisenberg* became final in 2001. Husch–LLC filed its action for reformation in January 2005, well within the ten-year statute of limitations for such an action under section 516.110.

Eisenberg asserts that the statute of limitations started to run on June 15, 1994, when the Release was executed, citing to *Stark v. Zehnder*, 204 Mo. 442, 102 S.W. 992, 995 (1907) and *Nuspl*, 842 S.W.2d at 923. While the Missouri Supreme Court did hold in *Stark* that the statute of limitations in a reformation action began as soon as the mistake was made, we note that the decision in that case was made prior to an amendment to the law regarding when statutes of limitation start to run. At the time of the decision in *Stark*, the statute provided that:

Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued.

Section 4271 RSMo 1899. This was amended in 1919 as follows:

Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued: *Provided*, that for the purposes of this article, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained **and is capable of ascertainment,** and if more than one item of damage, then the last item, so that all resulting damage may be recovered and full and complete relief obtained.

Section 1315 RSMo 1919 (emphasis added). This language has not changed since that time, and is currently set forth in section 516.100. Given the change in the statutory language since 1907, the precise holding in *Stark* is no longer fully controlling.

The only Missouri case since *Stark* that deals with the issue of when the statute of limitations for an action of reformation begins to run is *Nuspl*, 842 S.W.2d 920, which Eisenberg cites. Although this Court in that case did not directly address how section 516.100 applies to an action for reformation, that case is factually distinguishable from the circumstances of the present case. In *Nuspl*, plaintiffs filed an action for breach of contract, negligence, and reformation of contract in 1991. In 1979, a physician changed malpractice insurers and his malpractice coverage, and allegedly requested coverage to include insurance for all prior acts for which he could be liable. *Id.* at 921–22. The new policy, which went into effect in 1979, had a limited prior acts endorsement that pro-

vided the doctor with coverage for acts committed between December 1, 1976 and the date of the new policy's inception in 1979, leaving a gap in coverage for acts committed prior to December 1, 1976. *Id.* It was readily ascertainable from the face of the policy that it did not include language covering acts prior to December 1, 1976. There was no question of interpretation of the language of the contract, as there was no language to interpret.

This is in marked contrast to the present case. As previously noted, the fact that the phrase "law firm" did not include Goss and McKee was not capable of ascertainment until the Missouri Supreme Court's opinion in *Eisenberg* became final. It was not until that point in time that the evidence was such that a reasonably prudent person would have been placed on notice of a potentially actionable injury. Husch–LLC filed its action for reformation in January 2005, which is within the ten-year statute of limitations for such an action under section 516.110. We agree with the trial court's conclusions that there is nothing in law, equity, or *Eisenberg* that prevents the reformation of the contract. Point denied.

In her second point relied on, Eisenberg argues that the trial court erred in finding that Husch–LLC had standing to bring the reformation action because Husch–LLC failed to introduce any evidence showing its interest in the Release as it relates to the former partnership of Husch & Eppenberger.

Eisenberg contends in the argument portion of her brief that Husch–LLC did not make any claim that it is a party to the reformation action or that it is a successor in interest to the partnership of Husch & Eppenberger, presumably as it existed on June 15, 1994, or it has any direct interest in the Release. She asserts that the only claim that could possibly relate to an inter-

est of Husch–LLC in the Release is the claim in the petition that Husch–LLC is suffering damages because it is providing defense for Goss and for McKee. To the extent that this argument encompasses matters not raised in the point relied on, we need not consider such issues as they are not preserved for review. Rule 84.04(e); *City of Sullivan v. Truckstop Restaurants, Inc.,* 142 S.W.3d 181, 193 (Mo.App.2004).

■ Husch–LLC introduced into evidence the partnership agreements of Husch & Eppenberger, as amended and restated annually for the years 1994 through 1997. Husch–LLC also introduced the Articles of Organization of Husch–LLC and the Certificate of Organization, both effective on January 1, 1998. Paragraph 3 of each partnership agreement provides that: "The term of the Partnership shall continue from the effective date of this Agreement until the **death, retirement, or withdrawal of all Partners, or until the Partnership is terminated as provided in paragraph 30."** (Emphasis added). Paragraph 30 of each agreement, which addresses termination of the partnership, states that:

> The Partnership may be terminated and dissolved at any time by the written agreement of not less than two-thirds of all of the then Partners. Within ninety days after such termination and dissolution of the Partnership, a general accounting shall be taken of all of the assets and liabilities of the Partnership and the Partners shall make due provision for the payment of debts and the settlement of all liabilities of the Partnership (including any unmatured installments yet to be paid on account of the death, permanent disability, retirement, or withdrawal of a former Partner) and subject thereto, all of the remaining assets of the Partnership shall

be divided among the Partners in proportion to their respective percentage interests at the time of such dissolution.

In a number of other paragraphs, the partnership agreements address the issues of the death, retirement, withdrawal, and bankruptcy of partners, as well as a provision for adding new partners.

Section 347.125 addresses the conversion of a partnership to a limited liability company. Section 347.125.3 specifically provides that:

> When a general partnership or limited partnership is converted to a limited liability company pursuant to this section, the title to any real or personal property or any interest therein and all rights, privileges, powers, debts, **causes of action vested in the former partnership** shall be deemed to be transferred to and vested in such limited liability company without further act or deed. Confirmatory deeds, assignments or similar instruments to evidence the transfer may be executed and delivered at any time in the name of the partnership to the limited liability company.

(Emphasis added). Section 347.125.4 addresses the liabilities of and claims against a general or limited partnership that is converted to a limited liability company pursuant to the statute, and provides that such liabilities or claims shall attach to the limited liability company.

■ Although Missouri has enacted Chapter 358, titled "Uniform Partnership Law," partnership is still a creature of contract. *See In re Popkin & Stern*, 340 F.3d 709, 714 (8th Cir.2003) (applying Missouri law); *Heath v. Spitzmiller*, 663 S.W.2d 351, 354 (Mo.App.1983); *Rich v. Class*, 643 S.W.2d 872, 875–76 (Mo.App. 1982); *Haynes v. Allen*, 482 S.W.2d 85, 88 (Mo.App.1972). The Uniform Partnership Law provides the default rules, but the partnership agreement can supplant those default rules if it contains provisions or agreements to the contrary. *See id.* Accordingly, "it is possible for the agreement to provide for the continuation of the partnership pursuant to the agreement after occurrence of a condition that would normally dissolve the original partnership." *Rich*, 643 S.W.2d at 875–76. In the Husch & Eppenberger partnership agreements, paragraphs 3 and 30 provided that the partnership would continue until the death, retirement, or withdrawal of all partners, or the written agreement to dissolve of at least two-thirds of the partners extant at the time of such written agreement. This is precisely the same set of conditions as found in the partnership agreement at issue in *In re Popkin & Stern*, 340 F.3d at 714–15. The 8th Circuit Court of Appeals held that the federal district court was incorrect when it applied the provisions of the Uniform Partnership Law to the attempted dissolution, because the language of the partnership agreement controlled the requirements for dissolution, not the Uniform Partnership Law. *Id.*

■ Eisenberg cites to *Eisenberg*, 38 S.W.3d at 411 for the proposition that the Missouri Supreme Court has already held that the resignation of Goss in 1994 "resulted in the dissolution of the existing partnership and the formation of a new partnership." The Missouri Supreme Court did not in fact make such a holding. Its discussion of the issue was *dicta* in that it was not essential to the Missouri Supreme Court's decision. "Obiter dicta, by definition, is a gratuitous opinion. Statements are obiter dicta if they are not essential to the court's decision of the issue before it." *Richardson v. QuikTrip Corp.*, 81 S.W.3d 54, 59 (Mo.App.2002) (citations omitted). The Missouri Supreme Court's *dicta* are not binding. *McPherson v. U.S. Physicians Mut. Risk Retention Group*, 99 S.W.3d 462, 484 (*citing State ex*

*rel. Anderson v. Hostetter,* 346 Mo. 249, 140 S.W.2d 21, 24 (1940)).[4] The Missouri Supreme Court did not discuss in *Eisenberg* whether contractual partnership agreements could take precedence over the default provisions of the Uniform Partnership Law, and had it done so unnecessarily, such a discussion would also have been *dicta.*

The Husch & Eppenberger partnership that existed as of June 15, 1994 was not dissolved by the departure or death of any of the partners, or by the addition of new partners. And under the provisions of section 347.125.3–.4, Husch–LLC has all of the rights, privileges, obligations and liabilities of the former partnership of Husch & Eppenberger. Charles Merrill testified that he had been a partner of Husch & Eppenberger since 1984, that he served on the management committee of the partnership until it became a LLC on January 1, 1998, and that he has served on the management committee of Husch–LLC since that date. Merrill testified that it was part of the regular course of business for Husch & Eppenberger to annually execute written partnership agreements from 1994 until the conversion to a limited liability company in 1998. He identified the partnership agreements from 1994 through 1997 as records kept in the regular and ordinary course of business of the firm. The partnership agreements of Husch & Eppenberger from 1994 through 1997 were admitted into evidence. Merrill testified that Husch & Eppenberger never terminated or dissolved the partnership according to paragraph 30 of the partnership agreements, or according to any other paragraph therein up until the conversion to Husch–LLC on January 1, 1998. He identified the Articles of Organization of Husch–LLC and the Certificate of Organization, and stated that those documents were kept in the regular and ordinary course of business of the firm. Merrill testified that Husch–LLC has never been dissolved since its formation in 1998, that it was in good standing with the State of Missouri, and that it was the successor in interest to the Husch & Eppenberger partnership that existed on June 15, 1994. The Articles of Organization and the Certificate of Organization were admitted into evidence. The trial court also explicitly took judicial notice of section 347.125.3. There was substantial evidence to support the trial court's finding that Husch–LLC had standing in this case. Point denied.

In her third point relied on, Eisenberg asserts that the trial court erred in entering judgment and reforming the Release because the plaintiff is required to show a pre-existing agreement between the parties and the evidence indicated that there was not such an agreement as to the intent of the parties.

 Reformation is a remedy by which a party to a contract may obtain modification of the terms of the contract such that those terms reflect the original intent of the parties in forming the contract. *Lunceford v. Houghtlin,* 170 S.W.3d 453, 464 (Mo.App.2005). A party seeking reformation must establish that a mistake occurred that caused the contract language to differ from what the parties intended in their agreement. *Id.* Reformation is an extraordinary equitable remedy, but it is nonetheless available upon a showing that due to either mutual mistake or fraud, the writing fails to set forth accurately the terms of the true agreement

---

**4.** We note also that nothing in the opinion in *Eisenberg* suggests that any of the partnership agreements of Husch & Eppenberger were in the record before the Missouri Supreme Court or that the contractual language of those agreements was examined or considered. This was not a matter that was essential to the case.

or fails to incorporate the true prior intentions of the parties. *Id.* (quoting *Elton v. Davis,* 123 S.W.3d 205, 212 (Mo.App. 2003)). " 'A mutual mistake occurs when both parties, at the time of contracting, share a misconception about a basic assumption or vital fact upon which they based their bargain.' " *Alea London Ltd. v. Bono–Soltysiak Enterprises,* 186 S.W.3d 403, 415 (Mo.App.2006) (quoting 27 *Williston on Contracts 4th ed.,* Section 70:107, p. 536). This is normally a question of fact. *Id.* A unilateral mistake, by contrast, is a mistake on the part of only one of the parties and is not generally "an adequate basis for reformation." *Id.* at 415–16.

■ The petition filed by Husch–LLC requested reformation of the release to include Goss and McKee. It did not seek any further changes to the substance of the Release. Eisenberg testified in her deposition and at trial that it was her intent that Goss and McKee be included in the Release. Merrill testified that it was the intent of Husch & Eppenberger, when it executed the Release that "all attorneys and employees of Husch & Eppenberger and partners, and that would include McKee and Goss, would be released." He further testified that in his management capacity at Husch–LLC, he learned of the mistake that Goss and McKee were not included in the Release following the Missouri Supreme Court decision in *Eisenberg.* He further testified on this issue in the following exchange.

Merrill: Well, it was certainly our intention that—as I said before, that, you know, all partners, employees, and associates, et cetera, all attorneys associated with the firm who had worked on Mrs. Eisenberg's matter who otherwise might have vicarious liability, would be released.

Attorney: So the fact that Mr. Goss and Mr. McKee were not released pursuant to that Missouri Supreme Court opinion, that was not—that did not accurately carry out the intentions of the law firm when it entered into the agreement?

Merrill: Yeah. That's contrary to our intent.

The evidence amply shows that both parties to the Release intended to include Goss and McKee in the Release. Eisenberg contends that she did not intend that the Release relieve Goss or McKee of liability for legal malpractice. However, this was not the issue before the trial court in the reformation action and is not before this Court in this appeal. The issue in this case was whether the Release should be reformed, and the evidence presented showed that it was the intent of the parties to include Goss and McKee in the Release. The trial court did not err in entering judgment reforming the Release to include Goss and McKee. Point denied.

■ In her fourth point relied on, Eisenberg avers that the trial court erred in overruling her objection to the introduction of the partnership agreements that were introduced for the purpose of showing Husch–LLC as a successor in interest to the partnership of Husch & Eppenberger that executed the Release on June 15, 1994 because Husch–LLC is required to plead such a theory as a successor in interest and its pleading made no reference to any successor in interest. Eisenberg also contends in addition that she timely objected to the introduction of this evidence.

Eisenberg's argument on this point consists of two paragraphs totaling eight lines. It is utterly devoid of any citation to any authority, relevant or otherwise, or any explanation for the absence of any relevant authority in connection with the argument on this point. Pursuant to Rule 84.04(d)5, we deem this point to have been abandoned. *Brough v. Ort Tool and Die Corp.,*

149 S.W.3d 493, 498 (Mo.App.2004). Point denied.

The judgment of the trial court is affirmed.

MARY K. HOFF and ROY L. RICHTER, JJ., concur.